THE STATE ex rel. GEORGE L. FRAZER et al., v. WILLIAM J. SEIBEL, County Clerk.

THE STATE ex rel. W. H. TEGETHOFF v. WILLIAM J. SEIBEL, County Clerk.

THE STATE ex rel. A. H. WERREMEYER v. WILLIAM J. SEIBEL, County Clerk.

**In Banc, December 1, 1914.**

1. **ELECTION: Coalition of Parties: Printing Names on Different Tickets.** The Act of 1913, prohibiting party fusion and denying to a candidate of one political party the right to have his name also printed on the party ticket of another political party as its candidate for the same office, having been *held* unconstitutional (261 Mo. 515), the county clerk has no power to refuse to print the name of a candidate for Representative upon the tickets of two political parties, where he has been nominated at a primary election by one of such parties, and substituted by the county committee of the other in the stead

of its own candidate for the same office who has resigned. The statutes as they now stand do not prohibit a man from being the candidate of two political parties.

Held, by GRAVES, J., dissenting, with whom WOODSON, J., concurs, that the Act of 1913 prohibiting fusion of political parties, is not unconstitutional, as held in State ex rel. Schmoll v. Drabelle, and whether it received the number of votes required by the Constitution was a question for the legislative body to determine, and that act being valid the peremptory writ of mandamus should be denied.

2. ———: ———: ———: Sec. 5848, R. S. 1909: Not Question for County Clerk. It is not for the county clerk to determine that the attempted substitution upon its party ticket of a candidate of another party for the same office, by the county committee, in the stead of its own nominee who has resigned, is in violation of Sec. 5848, R. S. 1909, providing that "no committee shall have the power to substitute, to fill any vacancy, the name of any person who is not known to be of the same political belief and party as the person for whom he is substituted." That section lays a duty upon the party committee, but it lays none on the county clerk, and it does not authorize him to exercise the judicial function of saying that the person substituted is known not to be of the same political belief and party as the person for whom he is substituted.

3. ———: Candidates: Payment of Filing Fee. Held, by BROWN, J., that a county clerk cannot refuse to print the name of a candidate for office on the party ticket on the sole ground that he had not paid the filing fee to the committee treasurer required by Sec. 5879, R. S. 1909. Said requirement is violative of the constitutional provision (Art. 2, sec. 9) ordaining that "all elections shall be free and open." That provision applies to both candidates and voters. Such a statute is against sound public policy.

## Mandamus.

WRIT ALLOWED.

*Albert Chandler* and *Wilfred Jones* for relators.

*A. E. L. Gardner* for respondent.

LAMM, C. J.—The three cases entitled as above are original proceedings in mandamus. They have a common purpose, were heard as one and decided as one

by a *per curiam* handed down on October 31, 1914. If fresh justice is the sweetest as Lord Bacon says it is, that *per curiam* filled the bill. It, *inter alia,* ordered that absolute writs issue and that an opinion follow. The opinion so ordered to follow, follows, thus:

The object of the alternative writs was to cite Seibel, clerk of the county court of St. Louis county (who was either recalcitrant, or *dubitante,* or both) to show cause, if any he had, why the names of relators Frazier and Morgan should not be printed on the official ballot for use in the then approaching State election as candidates of the Progressive party for the offices of State representative for the second district and judge of the county court for the first district in St. Louis county respectively, in lieu of one Mars and one Gardner who had resigned their primary nominations respectively for those offices on the Progressive party ticket; and have the same clerk show similar cause, if any he had, why the name of relator Tegethoff should not be printed upon the official ballot as the candidate of the Progressive party for the office of State representative for the first representative district of said county in lieu of one Morton, who had resigned his primary nomination for that office on the Progressive party ticket; and have the same clerk show similar cause, if any he had, why the name of A. H. Werremeyer should not be printed upon the same official ballot as the candidate for the office of collector of revenue upon the Democratic ticket, in lieu of one Gillick who had resigned his primary nomination for that office on the Democratic party ticket.

To those alternative writs, Seibel made return in the Werremeyer case which, by consent, stood as a return to the others, *mutatis mutandis.*

In substance, so far as material here, the return was to the effect that Werremeyer was nominated at the prior August primary as the candidate of the Progressive party for the office of collector of revenue,

and Gillick was similarly nominated as the candidate
for the same office on the Democratic ticket. That
Werremeyer had not withdrawn as a candidate upon
the Progressive ticket, but holds fast to that nomina-
tion, while at the same time endeavoring to get the
nomination of another party and to have his name
printed on the ticket of that other party by and through
the resignation of Gillick and a resolution of the Dem-
ocratic central committee of St. Louis county. That
he, Werremeyer, was not known to respondent nor to
said Democratic central committee, nor to the voters
of said St. Louis county to be a Democrat in belief,
nor as affiliated with the Democratic party, nor was
he known to be of the same political belief or party
as said Gillick; but, *contra,* was known to respondent,
to said committee and to said voters as a member of
the Progressive party and as a believer in its princi-
ples. That the said action of the Democratic central
committee (set forth in full in resolutions in the rec-
ord) was contrary to the provisions of Revised Stat-
utes 1909, section 5848.

It seems that relators in the other causes were the
regular nominees of the Democratic party, under cir-
cumstances outlined above, for the offices indicated
hereinbefore, and sought nominations from the Pro-
gressive party and to be put on the Progressive party
ticket by virtue of the resignations of the named candi-
dates of the Progressive party for the offices in ques-
tion, and to run on both tickets.

Relators filed a motion for judgment, and, on prec-
edent, it is our view that the issue, raised by such mo-
tion for judgment on the pleadings, is one of law alone.

On such record, no apparent useful purpose can
be subserved by extended discussion; since the prin-
ciples controlling the case have been lately announced
by this court, thus: In Nance v. Kearbey, 251 Mo.
374, an election contest, decided in 1913, the validity
of Kearbey's election for sheriff was questioned in

part on the ground that his name improperly appeared on two tickets. We resolved the case against the contention of contestant, putting our ruling in main part on the doctrine of State ex rel. v. Kortjohn et al., 246 Mo. 34, decided in 1912. One phase of the Nance-Kearbey case rode off on the assumption there was no existing statutory inhibition against two political parties doubling up their forces at an election and running the same candidates upon their two tickets if the coalition was regularly brought about. [Williams v. Dalrymple, 132 Mo. 62.] In 1913 the Legislature attempted a change in public policy in that particular. [Laws 1913, p. 327.] The new act prescribed a blanket ballot, containing, also an antifusion provision, whereby a candidate was denied the right to coquette with and embrace two nominations at the same time. [Laws 1913, sec. 5891, p. 327.] Now, in State ex rel. Schmoll v. Drabelle et al., Board of Election Commissioners of the City of St. Louis, 261 Mo. 515, it was held that this Act of 1913 was not enacted in accordance with the safeguards and requirements of the Constitution. By that decision that act, apparently the only recognized barrier in the way of fusion on candidates, was struck to the ground and became the same as if it never had been. Hence, as to the law of the instant cases, the situation is precisely as it was when the Nance-Kearbey case and the Williams-Dalrymple case were ruled, namely, political parties were allowed to fuse by nominating the same candidates and, to that end, filling vacancies on their tickets occurring after primary nominations. It becomes evident, then, that on the authority of the cases cited, absolute writs were providently awarded unless there is something of substance in respondent's contention that section 5848, Revised Statutes 1909, stands as a lion in the way. Attend to that section. It reads: "The central committee of a political party shall consist of the largest body elected for the purpose of representing and acting for the party in the interim

between conventions of the party. That for the pur-- pose of making nominations to fill vacancies on a ticket previously nominated a majority of all the members-elect of a central committee shall be necessary to take action. That a central committee shall not have the power to delegate its authority to make nominations to any persons or number of persons, and that any act consequent upon any such delegation of authority shall be held to be null and void. That no central committee shall have the power to substitute, to fill any vacancy, the name of any person who is not known to be of the same political belief and party as the person for whom he is substituted.''

We are of opinion that respondent county clerk, neither by name, office nor intendment is within the purview of that section, hence, has no call or right to invoke its provisions in showing cause in his return. That section laid no duty on him. It laid a duty on the central committee of the party. Whether a violation of that duty is to be corrected by electors at the polls when chance offers or can be corrected by the courts in an appropriate and timely action, we need not decide. It is enough for us to hold that it will be time enough for county clerks to constitute themselves judges of the delicate question of the political beliefs of candidates when the lawmakers say so, not before.

The next section of the statute (Sec. 5849) prescribes a method of testing out objections to certificates of nomination—a method held preclusive in the Nance-Kearbey case. It is not pretended in these cases that any steps were taken under section 5849 to obtain any relief provided for therein.

It is on such premises, I am instructed by a majority of the Brethren to say that our absolute writs were awarded at the hearing by a *per curiam,* were served *instanter* and became effective.

All concur, except *Woodson* and *Graves, JJ.,* who dissent in an opinion by *Graves, J.,* in which *Woodson, J.,* joins.


BROWN, J. (concurring).—I concur in the views expressed in the majority opinion by our learned Chief Justice, but there is another issue tendered by respondent's return which should not be passed over in silence.

In said return it was asserted that relator Werremeyer was not entitled to have his name printed upon the ballots of the Democratic party because he had not paid the filing fee to the Democratic Central Committee, as required by section 5870, Revised Statutes 1909. In response to this defense it was urged by our learned Attorney-General that the failure of the relator to pay the filing fee is no defense in this case, because the law requiring such fee to be paid is in violation of section 9, article 2, of our Constitution, which, among other things, ordains that "all elections shall be free and open." In this contention the Attorney-General is correct.

The "free and open" clause of our Constitution is intended to have some application to both candidates and voters. With such restrictions as will demonstrate that a reasonable number of persons desire to vote for a candidate he should be allowed to aspire to public office and submit his claims to the voters.

Sections 5860 and 5870 of our primary election law require candidates for public office to pay sums of money into the treasury of the political party on whose ticket they wish to be nominated before their names can appear upon the ballots of that party. To my mind such laws are against sound public policy. The State is friendly to all political parties, but upon no theory of honesty or fairness can it have a desire to

promote the *financial welfare* of any political organization.

In a recent case of this character arising under the Constitution of Illinois (which is in almost the precise language of our own organic law so far as it pertains to elections), it was held by the highest appellate court of that State that a primary election law was void because it required candidates for office to pay sums of money into the public treasury, thus putting a cash price on the right of a citizen to aspire to office. [People ex rel. v. Board of Election Comrs., 221 Ill. 1. c. 21-23.]

If our own primary law were as good as the one condemned by the highest court of Illinois I should hesitate to enter my protest against its enforcement, for it is well known that if the money required by our law to be paid to political committees by candidates were paid into the public treasuries of the several counties and cities of our State the cost of holding our biennial primary elections would be lifted from the shoulders of the taxpayers and placed upon the candidates, and thus the public treasuries would gain many thousands of dollars.

Just think of the great State of Missouri requiring the payment of sums of money (vast in the aggregate) to the treasurers of political parties to be used in promoting the election of persons who happen to be nominated, and, perchance, to be used in corrupting the electorate into voting for candidates who may or may not be worthy of the offices to which they aspire. Such a law is enough to make every honest man in our State hide his face with shame.

The primary election law we now have is obviously intended to help the party which is temporarily in the ascendency. It no doubt helps the Republican party in St. Louis county, for by the election returns we see that the Republican candidates usually win in that particular county; consequently, many persons will seek

nominations on that ticket and pay money to the treasurer of the Republican committee of that county for the chance of being nominated. It helps the Democratic party in Monroe county, and probably helps the Progressive party in Mercer, but it hurts minority parties everywhere, because it discourages persons from becoming candidates upon the ticket of a minority party, however much their views may be in accord with its principles, and to that extent at least it impedes the "free and open" elections which are contemplated in our Constitution. Under the guise of law it takes money from candidates all over the State, which, if collected at all, should be paid into the public treasuries of the several counties and cities, thereby relieving taxpayers who have quite enough burdens to bear without carrying the expense of primary elections.

Entertaining these views, I hold that those provisions of our primary election law upon which respondent relies are invalid, and that our absolute writ of mandamus was properly issued.

GRAVES, J. (dissenting).—I dissent from the order and judgment in this case awarding the peremptory writ of mandamus. Under the opinion of the majority of this court in State ex rel. Schmoll v. Drabelle et al., 261 Mo. 515, the writ should go, but I do not agree to that opinion. By that opinion the Act of 1913 prohibiting fusion of political parties was declared unconstitutional. In that my brothers were wrong. By that opinion they emasculated from the Constitution one whole section thereof. Section 37 of article 4 of the Constitution clearly makes the Legislature the forum in which to determine the question as to whether or not all legal and constitutional steps have been taken in the passage of a bill. By this section the determination of this question is taken away from the courts. Grant it that section 31 of the same article requires that a ma-

jority of the members shall vote for a bill before it shall become a law, and that the names of those voting for and against it shall be spread of record, yet under section 37, supra, the legislative body determines for itself whether or not these things have been done in the passage of the bill. If such body says, by the signing of the bill in the presence of the body, without objection, that such things duly appear, that is the end of the matter, and this and no other court can go behind such solemn judgment of the legislative body.

Under this view of the law the anti-fusion statute is a valid and binding statute, and for that reason this writ of mandamus should be denied. *Vide* dissenting opinion in State ex rel. Schmoll v. Drabelle et al., supra.

*Woodson, J.,* concurs in these views.